# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                                                Case No. 12-31448-WRS
                                                                     Chapter 7
ALEXANDRA ELIZABETH
ACOSTA-CONNIFF,

        Debtor.

_____

ALEXANDRA ELIZABETH
ACOSTA-CONNIFF,

        Plaintiff,                                      Adv. Proc. No. 13-03059

v.

ECMC,

        Defendant.


## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW


       This Adversary Proceeding is before this Court on remand from the District Court for

additional Findings of Fact and Conclusions of Law as set forth in its Memorandum Opinion and

Order dated January 5, 2018. (Doc. 95). The Court will divide its discussion into three parts. In

Part I, the Court will review the history of these proceedings. In Part II, it will make Findings of

Fact. In Part III, it will make Conclusions of Law. For the reasons set forth below, the Court

determines that excepting from discharge the debt owed to Defendant, ECMC would impose an

undue hardship on Plaintiff, Conniff.

# I. History of Proceedings

On June 13, 2012, Alexandra Elizabeth Acosta-Conniff ("Conniff") filed a petition in bankruptcy in this Court pursuant to Chapter 7 of the Bankruptcy Code. (12-31488, Doc. 1). On January 31, 2013, this Court entered an Order of Discharge pursuant to 11 U.S.C. § 727. (12-31488, Doc. 31). No distribution was made to creditors in this case. (12-31488, Doc. 43).

On March 21, 2013, Conniff filed a complaint, initiating Adversary Proceeding 13-3059, seeking a determination that the indebtedness owed to Defendant, Educational Credit Management Corporation ("ECMC"), should not be excepted from her discharge. (Doc. 1). This Court tried this matter on January 26, 2015. It heard oral testimony of Conniff, as well as several other witnesses, and considered documentary evidence submitted by both parties. On March 25, 2015, this Court entered a Memorandum Decision and Final Judgment, determining that the indebtedness should not be excepted from Conniff's discharge. (Docs. 62 & 63); *In re Acosta-Conniff*, 536 B.R. 326 (Bankr. M.D. Ala. 2015), *rev'd sub nom. ECMC v. Acosta-Conniff*, 550 B.R. 557 (M.D. Ala. 2016), *judgment entered*, No. 2:15-CV-220-WKW, 2016 WL 1743109 (M.D. Ala. May 2, 2016), and *vacated sub nom. In re Acosta-Conniff*, 686 F. App'x 647 (11th Cir. 2017).

ECMC appealed this Court's judgment to the District Court, which reversed, pursuant to its Memorandum Opinion and Order and Final Judgment dated May 2, 2016, holding the debt should be excepted from Conniff's discharge. (Docs. 83 & 84); *ECMC v. Acosta-Conniff*, 550 B.R. 557 (M.D. Ala. 2016), *judgment entered*, No. 2:15-CV-220-WKW, 2016 WL 1743109 (M.D. Ala. May 2, 2016), and *vacated sub nom. In re Acosta-Conniff*, 686 F. App'x 647 (11th Cir. 2017). Conniff then appealed the District Court's judgment to the United States Court of Appeals for the Eleventh Circuit. The Appellate Court vacated the decision of the District Court pursuant to a Per Curiam Opinion and Judgment dated May 19, 2017, and remanded for further proceedings. (Docs.

92 & 93); *In re Acosta-Conniff*, 686 F. App'x 647 (11th Cir. 2017). On remand, the District Court entered a second decision, entered January 5, 2018, which in turn remanded the case to this Court for additional Findings of Fact and Conclusions of Law as to whether Conniff satisfied her burden of proving each of the three elements under *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987) to warrant a determination of undue hardship. (Doc. 95); *ECMC v. Acosta-Conniff*, 583 B.R. 275, 278 (M.D. Ala. 2018).

On February 6, 2018, the Court conducted a telephonic status conference with counsel for the parties to inquire whether additional evidence should be taken due to the questions raised by the District Court and the passage of time since the Court heard evidence. The *Brunner* test calls for the Court look at Conniff's situation at the time of trial, as well as consider likely future events which would impinge upon her ability to repay her student loans. The Court is thus required to act as if it is January 26, 2015, and "predict" events, some of which may or may not have already taken place. Outside of the Court's record, the Court is ignorant as to what events have transpired following the trial. To the extent the Court incorrectly "predicts" actual events which have since taken place, the Court notes that both parties were afforded the opportunity to offer evidence and chose not to do so. Instead, the parties submitted Proposed Findings of Fact and Conclusions of Law. (Docs. 105 & 106). The Court does not intend its comments as criticism of the lawyers; indeed, their submissions were well-written and quite helpful. The Court's Findings of Fact are based upon the undersigned's recollection of the trial testimony, bolstered by a fresh reading of the transcript; a review of the documents offered into evidence; a review of the Proposed Findings of Fact and Conclusions of Law provided by the parties (Docs. 105, 106, & 107); and consideration of the decisions handed down by the District Court and the Eleventh Circuit, which have become the law of the case.

## II. Findings of Fact

The Court will divide its Findings of Fact into four parts. In Part A, it will find facts generally applicable to this proceeding. In Parts B, C, and D, respectively, it will find facts directed by the three-part test in *Brunner*.[1]

## A. General

Conniff is a 44-year old single mother of two sons, aged 14 and 16. She holds multiple degrees from Auburn University: a Bachelor of Science in Chemistry, a Master's Degree in Learning Disabilities, a Master's Degree in Educational Leadership, and a Ph.D. in Special Education. Conniff lives in Eufaula, Alabama and teaches science at Eufaula High School.

Conniff has been a teacher since 1997. She has taught on a full-time basis for most of that time in the Eufaula School System and for a short time in Jefferson County, Alabama. She has also taught part-time at the college level at Auburn University in Montgomery, Alabama. Conniff believes she is good at her job and is proud to have received the Walmart teacher of the year award in 2008 and her school's teacher of the year award in 2012. Conniff has tenure at her current position in Eufaula and is reluctant to move because she would lose her tenure. In addition, her parents live in Eufaula and a move would necessarily entail some loss of support inherent in the close proximity of family.

For most of her time teaching in the Eufaula school system Conniff has taught special education. However, due to health issues, she was forced to take a position teaching science

---

[1] Unless otherwise noted, the Court's Findings of Fact are as of the January 26, 2015 trial date. Further, unless otherwise noted, these facts are either undisputed or were not objected to at trial. *See generally* Doc. 78, Transcript of January 26, 2015 Trial.

because it is less physically taxing for her. Conniff suffers from morbid obesity and has adult onset, Type II Diabetes. She takes oral medication and is under the care of a physician for her condition.

To finance her education, Conniff took out three different student loans. ECMC is the current holder of Conniff's student loan debt. Conniff currently has two consolidated loans with ECMC. The combined balance of the loans is $112,281.06. Conniff has paid $9,275.42 toward her loans. Over a period of 10 years, because of Conniff's income and family situation, ECMC issued 5 forbearances and 1 deferment in payments on the loans, meaning she was not required to make payments. As of the trial date, the loans remain in forbearance.

In addition to Conniff's testimony at trial, the Court heard oral testimony from three other witnesses: Yamandu Acosta[2] and Sylvia Acosta, Conniff's parents, and Jennifer Skerbinc, a litigation specialist with ECMC. The Court found all four witnesses to be forthright and credible.

Mr. and Mrs. Acosta were called by Conniff to testify generally regarding her financial situation. Mr. and Mrs. Acosta both testified they have provided Conniff with financial assistance for many years, including, but not limited to Mr. Acosta paying for air-conditioning repairs, plumbing repairs, and doctor co-pays and Mrs. Acosta paying for gas, school supplies, and baby-sitters. Conniff's parents also assist Conniff by frequently cooking meals for Conniff and her children due to Conniff's inability to provide food for herself and her children.

ECMC called Jennifer Skerbinc to testify. The Court permitted Ms. Skerbinc to testify telephonically. According to Ms. Skerbinc, Conniff is eligible for an income-based repayment

---

[2] The transcript incorrectly identifies Mr. Acosta as "Jim Angelo Acosta." This error was identified in Plaintiff's Proposed Findings of Fact and Conclusions of Law. (Doc. 105, p. 8, n. 5).

plan ("ICRP").[3]  Based upon Conniff's current income of $57,000.00 per year, her payment under an ICRP would be $346.00 per month.  Conniff would make 120 monthly payments of $346.00 each and the remaining balance owed on the loans would be forgiven.  Conniff would have to reapply each year and provide a current tax return.  From this, the Court infers the monthly payment could increase or decrease, depending upon Conniff's most recent income figures. Skerbinc further testified that there were other repayment options available to Conniff, but that those repayment plans would typically involve higher payments.

### B. Whether Conniff Can Maintain, Based on Current Income and Living Expenses, a "Minimal" Standard of Living for Herself and Her Dependents if Forced to Repay the Loans– The First *Brunner* Prong.

To determine whether Conniff can maintain a "minimal" standard of living if forced to repay the loans, the Court must determine three amounts: (1) Conniff's current monthly income, (2) Conniff's reasonable monthly expenses, and (3) the amount necessary to repay the student loan indebtedness.  This determination under the first *Brunner* prong is not a purely mathematical calculation, but it is informed by the numbers.

In the instance that Conniff cannot pay, in full, her student loan indebtedness and maintain a "minimal" standard of living, the District Court has directed this Court to determine whether an ICRP is available, and if so, whether Conniff can make a reduced ICRP payment and maintain a minimal standard of living.  (Doc. 95, p. 8).  In the event she can do so, the District Court has determined that the first *Brunner* prong has not been met and that the student loan shall be determined to be nondischargeable.

---

[3] Throughout the case, the terms "income-based" or "income-contingent" have been used interchangeably when referring to the repayment plan option that is calculated based on a debtor's income.  For consistency, this Court will use the acronym "ICRP".

## 1. Current Income

Conniff's current monthly gross pay, as established by her paystub for the period ending December 5, 2014, is $4,950.75.  Plaintiff's Exhibit C; *see also* (Doc. 84, p. 5, n.2).  Counsel for ECMC elicited testimony from Conniff regarding extra income she earned by teaching during the summer and argues in its proposed findings that an additional $250 per month should be added to account for this extra income.  (Doc. 106, p. 7).  However, there was nothing in Conniff's testimony to indicate this is regular income to be expected every year.  Therefore, the Court will not consider this amount as part of Debtor's regular monthly income.

At trial, Conniff also testified that she has tried to maximize her income by taking on side teaching jobs when possible.  However, when questioned further, Conniff explained that these jobs are not lucrative due to the expenses associated with these positions and are not available on a regular basis:

> [Conniff]A     Okay.  If I do adjunct work at AUM I get $3,000 over from like the semester, January to May.  And so it's like 250 – I get 250 about a month, after taxes and retirement.
>
> [Manuel]Q     Okay.
>
> A     And so but I spend more getting here than I do get –
>
> Q     Okay. So do you often do those kind of side jobs, though? They're available to you, you just –
>
> A     Like, I haven't -- the last time I did that was in January of 2014, but I didn't have any adjunct work fall of this year.
>
> Q     Okay.
>
> A     Or fall of the previous year.

Q    Okay.

A    Of 2013. So sporadically.

(Doc. 78, Transcript of January 26, 2015 Trial at 28). When asked by ECMC whether reduced expenses would allow Conniff "to take on more of these part-time side jobs," Conniff further testified as follows:

> [Conniff]A    I would -- there's not enough hours in the day. With me taking this lateral move to a secondary science –
>
> [Manuel]Q    Right.
>
> A    -- I'm having to prep and prepare for -- we're on block schedules. So I have three classes.
>
> Q    Okay.
>
> A    And so that's taking up more of my time, and so I don't physically have enough time –
>
> Q    Right.
>
> A    -- to take on more jobs. Even though I could use the money, I can't.

(Doc. 78, Transcript of January 26, 2015 Trial at 36). The Court finds that Conniff's extra income is not sufficiently regular to call for an adjustment upwards in her monthly income, beyond the $4,950.75 figure discussed above. In addition to Conniff's income received from her employer, Conniff testified she also receives $503.00 per month in child support for her two children. Conniff's gross monthly income, inclusive of child support, is $5,453.75.

## 2. Current Expenses

The Court will next consider Conniff's reasonable monthly expenses, which will be subdivided into two categories. First, it will consider the deductions from Conniff's gross pay which are contained in her paystub, resulting in her monthly pay, net of payroll deductions. Second, it will consider her monthly expenses which she pays out of her "take home" pay.

### a. Payroll Deductions

Conniff's payroll deductions, as evidenced by paystubs offered into evidence, are as follows: (1) Social Security $285.66; (2) SS Adm $66.81; (3) Fed. Tax $618.96; (4) State Tax $176.64; (5) Retirement (mandatory) $371.31; (6) PEEHIP (healthcare insurance) $222.00; (7) AFLAC (insurance) $87.70; (8) RSA-1/PEIR (voluntary retirement contribution) $220.00; AFLAC (insurance) $123.70, for total payroll deductions of $2,172.78. Thus, Conniff's "take home" pay is $2,777.97.

ECMC objects to the $220.00 deduction for a voluntary pension plan payment. While the Court rejects a categorical disallowance for any voluntary pension plan contribution, the burden is on Conniff to prove the extra payment is reasonable and the additional retirement benefit afforded by the voluntary contribution is appropriate under the facts of this case. The evidence does not establish the expected amount of Conniff's retirement benefit, how much additional it will be with the voluntary payment, and why the additional amount is necessary or appropriate. Therefore, the objection of ECMC is sustained and the deduction for the voluntary contribution to the pension plan is disallowed.

There are three payroll deductions for insurance: healthcare insurance and disability insurance (short-term and long-term). The Court finds the healthcare insurance is appropriate, and

it does not appear that ECMC objects to that deduction.[4]  Given Conniff's established medical conditions, the Court also finds the deductions for disability insurance are appropriate.

As stated above, Conniff's net pay is $2,777.97 and if the $220.00 deduction for the voluntary pension contribution is added back, Conniff's adjusted net pay is $2,997.97.  Factoring in the $503.00 Conniff receives each month in child support payments, the Court finds that Conniff's total monthly net income is $3,500.97.

| | |
|---|---|
| Gross Payroll Income: | $4,950.75 |
| | |
| Payroll Deductions: | |
| Social Security | $285.66 |
| SS Adm | $66.81 |
| Fed. Tax | $618.96 |
| State Tax | $176.64 |
| Retirement (mandatory) | $371.31 |
| PEEHIP | $222.00 |
| AFLAC | $87.70 |
| RSA-1/PEIR (voluntary) | $220.00 |
| AFLAC | $123.70 |
|    Total Deductions: | $2,172.78 |
| | |
| Net Payroll Income: | $2,777.97 |
| RSA-1/PEIR (voluntary) | $220.00 |
|    Adjusted Net Pay: | $2,997.97 |
| | |
| Monthly Child Support: | $503.00 |
| | |
| Total Monthly Income: | $3,500.97 |

---

[4] ECMC objects to some of Conniff's insurance expenses.  But, as it seems the objection is regarding life insurance payments paid by direct payment rather than payroll deduction, the Court will consider the objection in Part II.B.2.b.

### b. Monthly Expenses

Conniff's monthly expenses are established primarily by her Schedule J, Current Expenditures of Individual Debtors and her trial testimony. (12-31448, Doc. 1, Sch. J); *see generally* Doc. 78, Transcript of January 26, 2015 Trial. Copies of Schedule J were submitted as exhibits by both Conniff and ECMC. As explained more fully below, the Court makes the following findings as to the reasonableness of Conniff's listed expenses.

1. *Home Mortgage:* Conniff established a monthly mortgage expense, inclusive of real estate taxes and property insurance, of $737.00.

2. *Utilities:* Conniff established expenses totaling $617.00 for utilities, to include: electricity in the amount of $200.00; water and sewer in the amount of $60.00; cellular telephones with Verizon data plans in the amount of $160.00; cable with Bright House in the amount of $97.00, and a landline telephone and home internet with BellSouth in the amount of $100.00.

3. *Home Maintenance:* Conniff claims a monthly home maintenance expense of $100.00, which ECMC disputes. The Court notes that the figures published on the United States Trustee's Office for means testing, for the time period including the date of trial, and a family size of 3 people in Barbour County, Alabama, is $588.00 for non-mortgage expenses and $644.00 for mortgage expenses, for a total of $1,232.00.[5] The $100.00 claimed by Conniff is probably too conservative as noted by the point of comparison

---

[5] The means test for local standards for housing and utilities includes additional items, such as utilities, telephone, internet, and cable. Therefore, to conduct an apples-to-apples comparison, additional amounts would have to be added. To be sure, the means test amounts are not determinative here, rather the Court uses them for a point of comparison.

Case 13-03059   Doc 114   Filed 09/29/21   Entered 10/01/21 11:45:03   Desc Main
Document   Page 11 of 39

with the means test figures. Furthermore, Conniff submitted photographs of her home, which evidence deferred maintenance, another factor indicating that the $100.00 figure is too low. Plaintiff's Exhibit G; (Doc. 78, Transcript of January 26, 2015 Trial at 9-10). Nevertheless, the Court will use the $100.00 amount offered by Conniff. The objection of ECMC on this point is overruled.

4. *Food:* Expenses for food in the amount of $700.00 per month were established.

5. *Clothing:* A clothing budget of $150.00 per month was established.

6. *Laundry and Dry Cleaning:* Expenses for laundry and dry cleaning of $60.00 per month were established.

7. *Medical and Dental Expenses*: Medical and dental expenses, not covered by health insurance, including co-payments, of $100.00 per month were established.

8. *Transportation:* Transportation, exclusive of car payments in the amount of $400.00 was established. In addition, a car payment of $410.00 was established.

9. *Recreation and Entertainment:* Recreation and entertainment expenses of $170.00 per month were established, to include a $150.00 monthly membership to the local community center for Conniff and her children and a $20.00 Netflix subscription.

10. *Charitable Contributions*: Conniff's Schedule J listed charitable contributions of $30.00 per month. However, at trial, Conniff testified the amount was $50.00 per month. ECMC did not object to this amount. Therefore, the Court finds charitable contributions in the amount of $50.00 were established.

11. *Insurance:* Life insurance of $170.00 per month and automobile insurance of $60.00 per month was established. ECMC objects to this deduction. Considering these two amounts, a $60.00 expense for automobile insurance is plainly reasonable on its face.

As for life insurance, one may always quarrel whether one is under- or over-insured. Admittedly, the evidence does not contain much detail, other than the monthly payment amount, however, considering a $170.00 monthly expense for life insurance for Conniff and both of her children, the Court finds the amount is reasonable.

| **Monthly Expenses:** | | |
|---|---|---|
| **Home:** | Mortgage: | $737.00 |
| **Utilities:** | Electricity: | $200.00 |
| | Water & Sewer: | $60.00 |
| | Cell Phones: | $160.00 |
| | Cable: | $97.00 |
| | Landline & Internet: | $100.00 |
| **Home Maintenance:** | Repairs: | $100.00 |
| **Food:** | | $700.00 |
| **Clothing:** | | $150.00 |
| **Laundry & Dry Cleaning:** | | $60.00 |
| **Medical & Dental Expenses:** | | $100.00 |
| **Transportation:** | Car Payment: | $410.00 |
| | Costs: | $400.00 |
| **Recreation & Entertainment** | Community Center Membership: | $150.00 |
| | Netflix: | $20.00 |
| **Charitable Contributions:** | | $50.00 |
| **Insurance:** | Life Insurance: | $170.00 |
| | Automobile: | $60.00 |
| **Total Monthly Expenses:** | | $3,724.00 |

### 3. Repayment of The Student Loans

After identifying Conniff's income and expenses, the Court turns its focus on the third component under the first *Brunner* prong: the amount necessary to repay the loan. The Court first considers the amount necessary to repay the entire indebtedness. Then, the Court considers

-13-

Conniff's eligibility for an ICRP and the amount necessary to repay a portion of the indebtedness under an ICRP, with the balance to be forgiven upon completion of the ICRP payments.

### a. Repayment of The Entire Student Loan Debt

Conniff was not represented by counsel at the January 26, 2015 trial. While evidence was submitted as to the total amount of the indebtedness and her monthly expenses, Conniff did not make a calculation of the monthly payment necessary to repay the loan.[6] The Court calculated a payment of $915.00 per month. (Doc. 62, p. 2, n. 2). The District Court discussed this calculation in its January 5, 2018 Memorandum Decision. (Doc. 95, p. 4). While neither the District Court nor ECMC had any quarrel with this Court's calculation, Conniff's counsel sharpened their pencils and arrived at a figure of $843.00. (Doc. 105, p. 18). In light of Conniff's proposal, the Court will use that figure. Accordingly, the Court finds the amount necessary to repay the student loans in full is $843.00 per month for a period of 15 years. (Doc. 105, p. 18).

### b. Eligibility for and Repayment of the ICRP

In accordance with the District Court's decision on remand, the Court must also consider Conniff's eligibility for an ICRP and the amount necessary to repay the student loans under the ICRP. ECMC offered the testimony of Jennifer Skerbinc, its litigation specialist, who testified that Conniff would qualify for an ICRP. She further testified that, given Conniff's current situation, the monthly payment would be $346.00. Conniff would have to submit updated financial information and reapply each year. After 10 years, the loan would be forgiven. Accordingly, the

---

[6] The figures proffered by Conniff reflected monthly living expenses in excess of her income. Perhaps she concluded that such a calculation would be superfluous.

Court finds that Conniff is eligible for an ICRP and the repayment amount under the ICRP is $346.00 per month.

### C. Whether Additional Circumstances Exist Indicating That Conniff's State of Affairs is Likely to Persist for a Significant Portion of The Repayment Period of The Student Loans– The Second *Brunner* Prong.

Under the second *Brunner* prong, the Court must consider whether additional circumstances exist to indicate Conniff's current financial situation is likely to persist for a significant portion of the repayment period. More specifically, the District Court has directed this Court to

> make findings including, but not limited to, Ms. Conniff's current and future childcare expenses; Ms. Conniff's current and future child support benefits; Ms. Conniff's ability to apply for higher paying jobs; the existence of annual pay raises; Ms. Conniff's decision to stay in the same geographical area; and Ms. Conniff's ability to pursue additional work alongside her current employment as a teacher.

(Doc. 41, p. 14). In addition to the District Court's directive, the Court will also consider Conniff's health and its long-term impact on Conniff's ability to repay her loans.

Conniff has two dependent sons, aged 14 and 16. The two will "age out" eventually, resulting in the loss of $503.00 per month in child support. In her Proposed Findings of Fact, Conniff states that her children's support costs her $558.33 per month by prorating $300.00 per month for lunches, $222.00 for health insurance, a cell phone bill of $134.00 to $278.00 per month and life insurance of $100.00 per quarter. (Doc. 105, p. 19). Netting the two figures, it appears that Conniff will experience an increase in available funds of $55.33 per month. The Court notes that, based upon its experience, children do not cease their need for support immediately upon reaching their 19th birthday. Emancipation is frequently a gradual process. In Conniff's case, it will likely take several years to achieve the $55.33 monthly savings resulting from her children's

-15-

emancipation. Considering Conniff's and her children's ages and the structure of her expenses, the emancipation of her children will, in the short run be a detriment, due to the loss of child support, followed by only a marginal overall improvement of her situation over a period of time. While the evidence does not permit the Court to attempt a precise measurement of either the slope or the length of this "ramp", it nevertheless exists. The Court finds that there will be no short- or even intermediate-term financial benefit from the aging of Conniff's children. The long term will be required to see any benefit in Conniff's financial situation. Moreover, the benefit will be small.

Conniff testified that she is at the top of her salary range for her teaching position. She sought a Ph.D. to qualify her for a position as either a principal, vice principal or other administrative position. She testified that her efforts in this regard were to no avail. Conniff received her Ph.D. in 2007 and the trial was held in 2015. Conniff is not precluded from making applications for promotions in the future; indeed, she did not testify that she would not–a factor going to good faith to be considered below. While it is not a certainty that she will never achieve a significant promotion, given her history, it appears that Conniff will remain in her present position without any significant increase in pay. This is also based on the Court's subjective evaluation of Conniff's appearance and demeanor at trial. The undersigned witnessed Conniff's painful walk from counsel table to the witness box due, presumably, from her morbid obesity and Type II Diabetes. From this, the Court finds that Conniff would find it difficult to earn a significant amount from extra teaching, in addition to her full-time job. The undersigned has served as an adjunct professor off and on for many years and finds the work rewarding and hopes to continue to serve in the future. But, such work is not financially lucrative. Conniff testified she earned $3,000 as an adjunct professor over the course of a semester. However, adjunct teaching is

Case 13-03059    Doc 114    Filed 09/29/21    Entered 10/01/21 11:45:03    Desc Main
Document        Page 16 of 39

sporadic, and the increased income is often offset by the increased expenses involved – gas, childcare, and food expenses.

The evidence established that Conniff's gross income increased by $205.00 per month from the date she filed bankruptcy (June 13, 2012) to the date of trial (January 26, 2015). However, based upon its experience, the Court is of the view that future raises will likely mirror the rate of inflation, but not exceed it by any significant amount. Additionally, Conniff testified that a teacher's salary is based off the teacher's salary matrix and raises are based off years of service. These increases in pay – "step increases" – are earned every three years. According to Conniff, at the time of trial, Conniff would have to wait two more years before she would be eligible for her next step increase.

ECMC argues that Conniff might be able to improve her earnings if she moves to Jefferson County, Alabama. It did not offer any evidence on this point; it simply makes a generalized "grass is greener" elsewhere argument. Where someone is working full-time in a field appropriate to their education, at a reasonable rate of pay, as is the case here, the Court will not find against a student loan debtor on the second *Brunner* prong, based on speculation that jobs elsewhere may pay marginally more. Furthermore, if the Court were to speculate about the potential for higher pay in a different geographic region, the Court would likewise need to adjust for the higher cost of living – and increased expenses – that would accompany a higher paying region, which ECMC would surely not want. ECMC also fails to account for the fact that Conniff has tenure with her current school system. Should Conniff decide to leave, she would lose her tenure and, therefore, lose the reassurance that she would continue to be employed as a teacher in the future.

Conniff also offered evidence that her health impinges upon her ability to repay the loans and that it is likely to persist into the future. Conniff testified she suffers from morbid obesity and

-17-

has adult onset, Type II Diabetes. She takes oral medication and is under the care of a physician for her condition. She further testified that she belongs to a community center and that exercise was recommended by her doctor. Conniff also complained that her health had an adverse impact on her career, requiring that she quit special education and instead teach science to tenth graders who do not have special needs. Her health also makes it more difficult to earn additional money through teaching as an adjunct.

### D. Whether Conniff Has Made Good Faith Efforts To Repay The Loans–The Third *Brunner* Prong.

The third prong under *Brunner* requires the Court to consider Conniff's prior efforts and activities to determine whether Conniff has made a good faith effort to repay the loans. Jennifer Skerbinc, ECMC's litigation specialist, testified that Conniff has paid $9,275.42 towards the debt. Given's Conniff's financial situation, this is a significant sum indicative of good faith.

Skerbinc further testified that Conniff has been given five forbearances and one deferment in her student loan payments. The affidavit of Lisa Thigpen, offered by ECMC, shows the following:

| | | |
|---|---|---|
| Deferment – School Half-Time | 08/16/06 | 08/03/07 |
| Forbearance – Late School Notification | 08/04/07 | 09/28/07 |
| Forbearance – Temporary Hardship | 11/04/10 | 04/05/11 |
| Forbearance – Temporary Hardship | 04/11/11 | 05/10/11 |
| Forbearance – Temporary Hardship | 06/15/11 | 11/15/11 |
| Forbearance – Temporary Hardship | 12/04/11 | 06/12/12 |
| Forbearance – Bankruptcy | 06/13/12 | 03/25/13 |

(Doc. 19-1).

Thus, Conniff was in either a loan deferment or a forbearance for most of the 6 years prior to her bankruptcy filing. The issuance of so many forbearances for temporary hardship prior to

Conniff's bankruptcy filing is strong evidence that she was suffering a hardship. Indeed, ECMC's litigation position, that she can repay the students loans without suffering an undue hardship, is undercut by its actions prior to Conniff's bankruptcy filing where ECMC repeatedly granted Conniff forbearances, finding on multiple occasions that she was suffering a temporary hardship.

Conniff testified that she applied three times for a partial forgiveness of her student loans as she was teaching in a rural area but was denied because she had consolidated her student loans. She admitted that she did not retain copies of the denials of her applications. Counsel for ECMC examined Skerbinc about Conniff's repayment options.

> [Manuel] Q: And what about the Public Service Loan Forgiveness Program, would she qualify for that?
>
> [Skerbinc] A: Very well possible that she could after 10 years of repayment with the loans being in good standing.
>
> * * *
>
> Q: And it's come to issue, do you have any record of Dr. Conniff applying for any of these repayment options previously?
>
> A: I do not.

(Doc. 78, Transcript of January 26, 2015 Trial at 56).

ECMC appears to use this testimony to question the veracity of Conniff's testimony about whether she did, in fact, apply for such a loan forgiveness. To that extent, the Court does not find this testimony persuasive. In response to Conniff's question on cross-examination, the following testimony was given:

> [Conniff] Q: Ms. Skerbinc, when -- do you have access to the U.S. Department of Education applications for the Loan Forgiveness Programs?
>
> A: It is all done on their website.

(Doc. 78, Transcript of January 26, 2015 Trial at 57).

It is undisputed that Conniff did not apply for an ICRP. However, the Court accepts Conniff's testimony that she did, in fact, apply three times for a partial loan forgiveness as a result of her teaching in a rural area. Skerbinc's testimony established that such applications are made to the U.S. Department of Education and, presumably, ECMC would have no record of that. The Court finds that Conniff has made application for a partial loan forgiveness. This effort is further evidence which supports a finding of good faith.

Conniff has been working full-time, or in school and working part-time, for the past 20 years. In addition, she has worked part-time as an adjunct professor at Auburn University in Montgomery, Alabama, has taught summers in Eufaula, and has worked part-time as a Spanish-English translator for the Eufaula School System. Conniff sought a Ph.D. so that she would qualify for advanced positions such as principal, assistant principal, or other administrative positions. While her efforts in this regard have not, thus far, been successful, these efforts are further evidence of her good faith. The Court finds that Conniff has acted in good faith to maximize her income.

Insofar as Conniff's efforts to minimize her living expenses to enable her to repay her student loans, the Court will consider its findings in Part II.B.2.b. above. The Court finds that her proffered expenses are reasonable. The Court finds that Conniff has made and continues to make a reasonable effort to minimize her living expenses. Conniff does not lead a lavish or even a very comfortable lifestyle. Her budget does not have enough room for home repairs, furnishings and clothing, as evidenced by photographs offered into evidence and her appearance at trial. Considering this evidence as a whole, the Court finds that Conniff has made reasonable efforts to minimize her living expenses.

-20-

## III. Conclusions of Law

This is a case to determine whether the student loan debt owed by Conniff to ECMC is dischargeable. The issue of law before the Court is whether Conniff can show that excepting the debt from discharge would impose an undue hardship on Conniff and Conniff's dependents. 11 U.S.C. § 523(a)(8).

### A. General Principles of Student Loan Discharge

The Bankruptcy Code provides that student loan debt is excepted from discharge under 11 U.S.C. § 523(a)(8). 11 U.S.C. § 523(a)(8). However, an exception exists when a debtor proves "excepting such debt from discharge . . . will impose an undue hardship on the debtor and debtor's dependents." *Id.* Therefore, discharging student loan debt is the exception, not the rule. Rather than impose an absolute bar to the dischargeability of student loan debt, Congress permits the dischargeability of student loan debts upon a showing of undue hardship. *In re Johnson*, 541 B.R. 759, 764 (Bankr. N.D. Ala. 2015); 11 U.S.C. § 523(a)(8).

### B. The *Brunner* Test

Section 523(a)(8) does not define undue hardship. However, the Eleventh Circuit has adopted the test set out in *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987) (per curiam), for determining whether an exception to discharge would be an "undue hardship." *In re Cox*, 338 F.3d 1238 (11th Cir. 2003). The *Brunner* test sets out three prongs that a debtor must satisfy to prove an undue hardship:

> (1) That the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans,

       (2)  That additional circumstances exist indicating that this state of affairs is likely
            to persist for a significant portion of the repayment period of the student loans,
            and
       (3)  That the debtor has made good faith efforts to repay the loans.

*In re Brunner*, 831 F.2d at 396; *In re Cox*, 338 F.3d at 1241.  The debtor must prove each prong

by a preponderance of the evidence.  *In re Mosley*, 494 F.3d 1320, 1324 (11th Cir. 2007).

**1.  Based On Her Current Income and Expenses, Conniff Cannot Maintain a Minimal
Standard of Living for Herself and Her Dependents if Forced to Repay the Loans.**

       The first prong of the *Brunner* test is to determine whether Conniff can maintain a

'minimal' standard of living for herself and her two dependents if forced to repay the loans.  *In re*

*Brunner*, 831 F.2d at 396.  A minimal standard of living is defined as "a measure of comfort,

supported by a level of income, sufficient to pay the costs of specific items recognized by both

subjective and objective criteria as basic necessities."  *In re Johnson*, 550 B.R. 874, 879 (Bankr.

M.D. Ala. 2016) (quoting *In re Ivory*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001)).  It "lies

somewhere between poverty and mere difficulty."  *In re McLaney*, 375 B.R. 666, 674 (M.D. Ala.

2007).  But, it requires "more than a showing of tight finances."  *In re Johnson*, 550 B.R. at 879.

To make this determination, courts compare "a debtor's disposable income, determined as the

difference between [a debtor's] monthly income and reasonable and necessary monthly expenses,

with the monthly payment necessary to repay the student loans."  *In re Johnson*, 550 B.R. at 879.

Accordingly, the Court must first identify three components: (1) Conniff's current monthly

income, (2) Conniff's currently monthly expenses, and (3) the amount necessary to repay the debt.

In doing so, the Court is required to examine Conniff's financial situation at the time of the trial to

evaluate her ability to repay the debt.  *See In re Acosta-Conniff*, 686 F. App'x 647, 648–49 (11th

Cir. 2017) ("The first prong focuses on the present ability of the debtor to repay the debt.").

### a. Conniff's Monthly Income

Under Part II.B.2.a. above, the Court identified Conniff's total monthly net income as $3,500.97. The Court arrived at this amount by first taking Conniff's gross payroll income of $4,950.75 and subtracting her payroll deductions of $2,172.78, for a net payroll amount of $2,777.97. The Court then recognized that Conniff should not be give the benefit of a voluntary pension contribution when evaluating her income under *Brunner*. *See, e.g., In re Gesualdi*, 505 B.R. 330, 341 (Bankr. S.D. Fla. 2013) (voluntary contributions to retirement plans are not necessary expenses to maintain a minimal standard of living). After adding back the $220.00 per month voluntary retirement contribution, the Court arrived at $2,997.97 as Conniff's adjusted net pay.[7] Finally, the Court added $503.00 to the monthly total, which represents the total amount Conniff receives in child support each month for her two children, bringing the net monthly total income to $3,500.97. While Conniff testified she occasionally works as an adjunct professor, the Court declined to include the income earned from the adjunct position after determining the extra income was not sufficiently regular to warrant an adjustment and because the extra income was offset by the extra expenses incurred as a result of the adjunct position, such as childcare, food, and travel. Accordingly, the Court finds Conniff's total monthly net income is $3,500.97.

---

[7] The $220.00 voluntary contribution to her 401k represents the pre-taxed amount. Had Conniff not made the voluntary contribution, she would not have received the full $220.00 because it would be taxed as regular income. Conniff asserts she would only receive around $150.00, not $220.00. However, for the purposes of calculating Conniff's income, the Court will not split hairs and will simply adjust her income by the full amount of $220.00, even if the amount is slightly inflated.

### b. Conniff's Reasonable Monthly Expenses

Under Part II.B.2.b. above, the Court identified Conniff's expenses from Schedule J and her trial testimony, totaling $3,724.00 each month. Conniff's expenses include a monthly mortgage payment of $737.00 and a home maintenance budget of $100.00 per month. She also pays $617.00 for utilities, which includes electricity, water and sewer, cable, landline telephone and home internet, and cellular telephones with Verizon data plans. Conniff has allotted $700.00 per month for food expenses for both herself and her two children. She also lists a clothing budget of $150.00 per month and laundry and dry-cleaning expenses of $60.00 per month. Conniff's car payment is $410.00 per month, car insurance is $60.00 month, and her other transportation expenses, exclusive of the car payment and insurance, are $400.00 per month. Conniff lists medical and dental expenses, not covered by insurance, as $100.00 per month. She pays $170.00 per month in life insurance. Conniff spends $170.00 per month on recreation and entertainment expenses, which includes a $150.00 community center membership and a $20.00 Netflix subscription. Lastly, Conniff pays $50.00 per month in charitable contributions.

To determine the reasonableness of expenses, courts rely on common sense, knowledge gained from ordinary observations in daily life, and general experience in making that determination. *See In re Ivory*, 269 B.R. at 899. The reasonableness of an expense should be considered in the context of its own category. *In re McLaney*, 375 B.R. at 682. In addition to housing, utilities, food, water, and hygiene products, courts have recognized the following as reasonable expenses:

> [] People need vehicles to go to work, to go to stores, and to go to doctors.
> They must have insurance for and the ability to buy tags for those vehicles.
> They must pay for gasoline. They must have the ability to pay for routine

maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

[] People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

[] People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

*In re Ivory*, 269 B.R. at 899. Additionally, expenses for cell phones, a landline, internet, and cable can be reasonable expenses in maintaining a minimal standard of living. *In re McLaney*, 375 B.R. at 674.

The itemized list of expenses shows Conniff has budgeted for her most basic needs, such as housing, maintenance, utilities, food, clothing, and personal hygiene. The Court finds these expenses, and the amounts stated, are reasonable and necessary for Conniff to maintain a minimal standard of living. In fact, it appears Conniff has likely undervalued some of these expenses as evidenced by her family's assistance. Conniff's father testified at trial that he has helped with the home maintenance by paying $500.00 to repair Conniff's air-conditioning duct work, paying $75.00 to a plumber to fix a burst pipe, and paying $150.00 to repair Conniff's front door after it was damaged by forced entry. (Doc. 78, Transcript of January 26, 2015 Trial at 47-48). Additionally, he has paid for lawn work and exterior home maintenance. (*Id.* at 48). He further testified that he often invites Conniff and her children over for meals and allows them to take food from their pantry and freezer because he knows Conniff does not have food at her house. (*Id.*). Finally, he testified that he occasionally assists with medical expenses not covered by insurance, including paying a $570.00 down payment for his grandson's braces and occasionally paying the $35.00 co-pays for doctor visits for Conniff and her sons. (*Id.* at 48-49). Additionally, Conniff's mother testified that she has paid for miscellaneous expenses for Conniff, including purchasing

gas for Conniff's automobile, paying a moving violation ticket incurred by Conniff, purchasing school supplies for her grandsons, and paying for babysitters while Conniff was teaching at AUM. (*Id.* at 51-52).

Conniff pays $410.00 per month for her car payment and has budgeted an additional $400.00 per month for transportation expenses, exclusive of insurance in the amount of $60.00 per month. The additional transportation expense includes such items as gas, maintenance, oil changes, tags, etc. The Court finds these amounts are reasonable.

Conniff pays $160.00 for three cellular phones with Verizon data plans. These days, cellular smart phones are a common expense in any household. However, Conniff testified that she also maintains a landline and home internet service, which costs $100.00 per month. ECMC argues these expenses are duplicative. But, just because Conniff pays for cellular phones does not mean she should be not permitted to also keep a landline. *See In re McLaney*, 375 B.R. at 675 (allowing expenses for two cellular phones and a home phone line). It is widely known that using cellular data for all internet needs can add up quickly. In fact, Conniff testified she had to limit the data plans for her children after she "got burned several times" from the charges incurred for going over the data plan. (Doc. 78, Transcript of January 26, 2015 Trial at 25-26). Also, because landline and internet services are often bundled together by service providers at a reduced cost, eliminating the landline would not likely free up much room in Conniff's budget. In general, a telephone line is a necessary expense for other functions, such as scheduling doctor appointments, contacting employers, or for emergency situations. *See In re McLaney*, 375 B.R. at 675. Conniff is a working mom that needs to be able to maintain contact with her children. Their cellular phones provide a means of doing so if either Conniff or her children are away from home. Moreover, Conniff has not budgeted for any additional childcare expenses. As such, the Court finds the

separate expenses for the cellular phones and the landline and home internet are reasonable expenses.

Conniff testified at trial that she pays $97.00 per month for cable television and $20.00 per month for a Netflix subscription. While the $97.00 cable cost seems a little high, the cable service provides a source of entertainment for Conniff and her sons. Likewise, the Netflix subscription also provides an entertainment benefit. Even though the Netflix subscription may seem redundant, given the nominal cost, the Court finds the $20.00 per month Netflix subscription to be a reasonable entertainment expense. However, even if the Court decided to eliminate the cable expense (the more costly expense), that only increases Conniff's monthly budget by $97.00. Currently, Conniff is operating on a monthly deficit of $223.03. Adding an additional $97.00 into Conniff's budget still does not allow Conniff to "break even" each month. But, since the Court has determined the cable and Netflix expenses are both reasonable, there is no need to consider an adjustment to Conniff's income.

While Conniff does have a monthly membership to a community center, Conniff testified at trial that her doctor advised her to lose weight and the community center has a gym and a pool for herself and her children to use. (Doc. 78, Transcript of January 26, 2015 Trial at 25). Since Conniff did not budget for other recreational activities to keep active and the community membership offers a health benefit for the whole family, it is reasonable to allow the $150.00 monthly membership. Under these circumstances, the Court finds the $150.00 expense is reasonable.

Conniff's Schedule J included a monthly charitable contribution of $30.00. At trial, Conniff clarified the actual amount is $50.00 each month and represents her membership fee to the Lions Club – a service organization whose mission is to prevent blindness and raise awareness

of conditions that affect sight. (Doc. 78, Transcript of January 26, 2015 Trial at 45-46). The Court recognizes the importance of giving of one's time and money to important service organizations. The Court finds a $50.00 per month service organization membership fee is a reasonable membership fee. *See In re McLaney*, 375 B.R. at 682 ("[C]haritable contributions are to be examined under the same reasonableness standard as other reasonable and necessary expenses under a § 523(a)(8) undue hardship analysis."). Accordingly, the $50.00 monthly charitable contribution is a reasonable expense.

Given Conniff's medical issues, it is reasonable for Conniff to budget for medical expenses that are often not covered by insurance. As such, the Court finds the $100.00 per month expense for medical and dental expenses is reasonable. Similarly, given Conniff's health and her desire to take care of expenses for herself and her children in the event of a tragedy, Conniff has life insurance policies on herself and both of her sons. (Doc. 78, Transcript of January 26, 2015 Trial at 37-38). Conniff testified she has two whole life insurance policies on herself for $150,000.00 each. Additionally, she has life insurance policies on each of her children in the amounts of $25,000.00 each. Conniff's pays $170.00 per month to maintain these policies.[8] In light of Conniff's age and medical conditions, the Court finds the $170.00 monthly expense for life insurance for both Conniff and her children is reasonable.

These stated expenses do not lead the Court to believe Conniff and her two children are living extravagant lifestyles. Instead, it paints a picture of a single mom, living a modest life, while working and relying on family assistance to make ends meet. Therefore, the Court finds Conniff's

---

[8] Conniff's Schedule J lists the expense as $170.00 per month. At trial, Conniff estimated she pays around $20.00 for each of the $25,000.00 policies for her children and around $60.00 per policy for each of her whole life policies. These amounts total $160.00. Counsel for ECMC and Conniff both rounded up to $180.00 per month in total. The Court is unable to determine whether this was an over-estimated approximation or a miscalculation. Accordingly, the Court will split the difference in amounts and proceed with the $170.00 per month figure as originally scheduled.

expenses, totaling $3,724.00, are reasonable and necessary to maintain a minimal standard of living for herself and her two sons.

### c. Conniff's Ability to Repay the Student Loan Debt

After identifying Conniff's income and reasonable expenses, the Court must compare those amounts with the monthly payment necessary to repay the student loan to determine whether Conniff satisfied the first *Brunner* prong. If Conniff's disposable net income is less than the loan repayment amount, then Conniff satisfies the first prong of the *Brunner* test.

### i. Repayment in Full

As established, Conniff has a monthly net income of $3,500.97. Conniff's reasonable monthly expenses total $3,724.00. Before even considering the amount necessary to repay the student loans in full, Conniff is already at a monthly deficit of $223.03. Conniff asserts that in order to repay the student loan debt in full, Conniff would need to pay $843.00 per month for 15 years. ECMC does not dispute this amount and the Court accepts Conniff's assertion. However, with a monthly income deficit, Conniff will never be able to repay the loans in full during the repayment period. Therefore, the Court finds that based on Conniff's current income and expenses, she cannot maintain a minimal standard of living for herself and her two sons and repay the student loan debt in full.

Having determined that Conniff cannot repay, in full, her student loan debt while maintaining a minimal standard of living, ordinarily, the Court's considerations under the first *Brunner* prong would be complete. However, the District Court, in its remand decision, instructed this Court to consider Conniff's eligibility for an ICRP when evaluating whether Conniff can satisfy the "minimal" standard of living prong of the undue hardship test. The

Case 13-03059    Doc 114    Filed 09/29/21    Entered 10/01/21 11:45:03    Desc Main
                    Document        Page 29 of 39

District Court directed this Court to determine whether Conniff is eligible for an ICRP, if so, what that payment is, and whether Conniff can afford to repay the debt under the ICRP. The courts of this Circuit differ on whether bankruptcy courts should consider an ICRP payment when evaluating whether a debtor can satisfy the minimal standard of living prong of the undue hardship test. *See In re Johnson*, 299 B.R. 676 (Bankr. M.D. Ga. 2003) (court refused to consider the ICRP payments, instead choosing only to consider whether the repayment of those loans in full would create an undue hardship without reference to the ICRP); *Graddy v. Educational Credit Management Corporation*, 615 B.R. 336 (N.D. Ga. 2020), *aff'd sub nom. In re Graddy*, 852 F. App'x 509 (11th Cir. 2021) (court noted bankruptcy court's decision to use the ICRP amount was likely not correct because the *Brunner* test examines repayment of the actual outstanding student debt); *see also In re Boykin*, 313 B.R. 516, 522 (M.D. Ga. 2004) (debtors were already enrolled in an ICRP and the court noted the inclusion of all student loan debt owed would not affect debtors' ability to maintain a minimal standard of living since their payment amount was based off of income, not the debt amount owed); *Educational Credit Management Corp. v. Stanley*, 300 B.R. 813 (N.D. Fla. 2003) (noting that "any available restructuring of th[e] debt that would ease the payment obligation also must be considered"); *In re Lederman*, Adv. No. 6:18-ap-00126-LVV, 2021 WL 1511637 (Bankr. M.D. Fla. March 30, 2021) (in denying a motion to reconsider, the court noted that debtor had sufficient income to make ICRP payments and maintain a minimal standard of living). And, the Eleventh Circuit has not directly decided the issue. Nevertheless, this Court is under a direct mandate from the District Court, and this Court will follow the mandate. [9]

---

[9] To support its mandate, the District Court relied on *Wieckiewicz v. ECMC*, 443 Fed.App'x 449 (11th Cir. 2011), an unpublished Eleventh Circuit decision. In *Wieckiewicz*, the Court affirmed a district court decision deciding a bankruptcy court did not abuse its discretion when it dismissed with prejudice a Chapter 7 debtor's adversary complaint seeking discharge of his student loan debt when the debtor continuously refused to comply with the

## ii. Repayment under an ICRP

Because Conniff cannot pay the full amount of the student loan indebtedness, pursuant to the District Court directive, the Court is required to consider Conniff's ability to repay the debt under an ICRP. First, the Court must determine whether Conniff qualifies for an ICRP. If so, the Court must next identify the amount necessary to fund an ICRP. If the Court finds that Conniff can pay that amount, then according to the District Court, Conniff fails the first *Brunner* prong. The District Court recognized that Conniff's eligibility in an ICRP may be outcome determinative under the first *Brunner* prong. It explained that if Conniff is eligible for and can afford to pay the ICRP payment while maintaining a minimal standard of living, then *Brunner*'s first requirement is not satisfied. In other words, the District Court concluded that the first *Brunner* prong cannot be met unless Conniff is either ineligible for an ICRP or if Conniff is unable to afford repayment of the debt under the ICRP.

In determining that Conniff is eligible for an ICRP, the Court accepts the testimony of ECMC's litigation specialist, Jennifer Skerbinc and the affidavit of Lisa Thigpen offered by ECMC both stating that Conniff is eligible for an ICRP. As to the amount of the ICRP, according to the calculation provided by ECMC, which the Court also accepts, the monthly payment amount under the ICRP would be $346.00. Then, the question becomes whether Conniff can afford to repay the debt under the ICRP while maintaining a minimal standard of living.

---

bankruptcy court's order to apply for an ICRP. While the Bankruptcy Court believes the District Court's interpretation of *Wieckiewicz* warrants further discussion, the Court will table that topic for future § 523(a)(8) undue hardship determinations and simply follow the mandate set forth in the remand decision. This Court's decision to follow the District Court's mandate without further discussion does not mean the Court agrees with the mandate or agrees eligibility for or affordability of an ICRP should be considered under the first *Brunner* prong in all § 523(a)(8) discharge cases.

Conniff's net monthly income totals $3,500.97. However, Conniff's total amount of monthly expenses are $3,724.00. This means that Conniff has a monthly income deficit of $223.03. This deficit is not enough to fund Conniff's basic monthly needs, let alone fund an ICRP payment of $346.00 each month. For Conniff to be able to afford the ICRP payment of $346.00 per month, Conniff would need to eliminate expenses totaling $569.03 per month.

In an effort to "run the numbers," the Court considers how eliminating certain reasonable expenses would affect Conniff's income. Under section III.B.1.b. above, the Court made findings as to the reasonableness of the Schedule J monthly expenses and "additional expenses" (cable, landline and internet, Netflix subscription, and corrected amount of charitable contributions) established through Conniff's trial testimony. If the Court were to just accept Conniff's Schedule J monthly expenses and eliminate the additional expenses established through Conniff's trial testimony, that would add $237.00 back to Conniff's income. This would bring Conniff's disposable monthly income to $13.97. While the increase would give Conniff a positive disposable monthly income, that is not determinative of the first *Brunner* prong. *In re McLaney*, 314 B.R. 228 (Bankr. M.D. Ala. 2004) (finding student loans were dischargeable on the basis of undue hardship when the debtors had a disposable income of $142.19 a month). Furthermore, the increased monthly income would still be insufficient to fund the reduced monthly loan payments under an ICRP of $346.00 per month. Conniff would still need to increase her disposable income by $332.03 to afford the ICRP payment. Therefore, even if Conniff were to eliminate certain expenses, despite being found reasonable by the Court, Conniff would still not have sufficient disposable income to make the reduced ICRP payment of $346.00 per month. The Court could continue to manipulate the numbers by requiring Conniff to eliminate various monthly expenses to increase her disposable net income; however, the undue hardship test does not require a debtor

to sacrifice basic needs to fund an ICRP. To do so would violate prong one of the *Brunner* test. Accordingly, the Court finds that Conniff would be unable to maintain a minimal standard of living and make the reduced monthly payment of $346.00 under the ICRP.

In sum, based on Conniff's monthly income and reasonable monthly expenses, Conniff cannot maintain a minimal standard of living for herself and her dependents if forced to repay the student loan debt in full or under an ICRP. Accordingly, the Court finds Conniff has satisfied her burden under the first *Brunner* prong.

## 2. Additional Circumstances Exist Indicating that Conniff's State of Affairs is Likely to Persist for a Significant Portion of the Repayment Period of the Student Loan Debt.

Under the second *Brunner* prong, the Court must evaluate whether additional circumstances exist indicating that Conniff's present situation is likely to persist for a significant portion of the repayment period of the student loans. *See In re Brunner*, 831 F.2d at 396; *In re Cox*, 338 F.3d at 1241. This determination is not based on a debtor's current inability to pay, but rather a showing that the inability to pay is likely to continue for a significant time, thereby creating a "certainty of hopelessness" that a debtor will be able to repay the loans. *In re Mosley*, 494 F.3d at 1326; *See In re Acosta-Conniff*, 686 F. App'x at 649 ("The second prong looks to the future to determine the unlikelihood that the debtor could become able to repay the loan."). Under the second *Brunner* prong, "[t]he Court must consider factors such as 'the debtor's age, age of the debtor's dependants, debtor's education, work and income history, physical and mental health, and other relevant circumstances.'" *In re Johnson*, 550 B.R. 874, 880 (Bankr. M.D. Ala. 2016) (citations omitted).

The Court cannot make an undue hardship determination solely based on Conniff's present financial situation. But rather, the Court is required to make a prognosis based on Conniff's

circumstances about the likelihood that Conniff will eventually be able to repay her student loan debt. To do so, the Court must identify and analyze any additional circumstances that would cause Conniff's financial situation to stay the same, thereby preventing Conniff from being able to repay the debt in the future. The Court finds Conniff has satisfied her burden under the second *Brunner* prong.

Conniff is a 44-year old single mother of two dependent sons, aged 14 and 16. Even though, after a few years, her two children will no longer be considered dependents, her financial responsibility for her children does not end. In other words, simply because a child is no longer a dependent does not mean the expenses associated with a dependent child cease immediately. On the other hand, once a child is no longer a dependent, the financial assistance in the form of child support does cease immediately. Even though Conniff's children are close to the age of majority, Conniff is not likely to see any immediate financial benefit from the aging of her children. Furthermore, any financial benefit will be offset by the loss of child support.

Conniff is a high school teacher. She is at the top of her salary range for her teaching position. As such, should she remain in her current position, it will be without significant increase in pay. While her gross income increased by $205.00 per month from the bankruptcy filing to the trial, that increase was the result of a step increase which, at her salary level, only occurs every three years. Aside from her step increases, Conniff's future increases in income will only result from cost-of-living increases. While Conniff has a Ph.D. that qualifies her for administrative positions, such as principal or vice principal, all efforts to further her career as an administrative professional have been to no avail. Conniff testified that, since 2007, she has applied for the following positions: assistant principal, principal, special ed coordinator, and federal programs coordinator. However, she has been denied advancement. She is a tenured teacher in her current

school district and moving to another district could result in her losing tenure and risk being fired without cause. Furthermore, should Conniff move away from Eufaula, she would be moving away from her family, whom she frequently relies upon for support.

Conniff suffers from morbid obesity and adult onset, Type II Diabetes. Conniff's health has already adversely affected by career by forcing her to quit teaching special education and teach 10th grade science instead. Her health condition also makes it more difficult to teach as an adjunct professor. While Conniff is making efforts to get control of her health, by taking medication and exercising at the community center, it is likely that, over time, her health will continue to decline.

Considering Conniff's age, health, terminal degree, that she is at the top of the pay scale for her position, and that she has previously sought promotions, to no avail, the Court finds that additional circumstances exist indicating that her present state of affairs is likely to persist for a significant portion of the repayment period. Accordingly, Conniff has satisfied prong two of the *Brunner* test.

### 3. Conniff has Demonstrated Good Faith Efforts to Repay the Loans.

Under the third, and final, *Brunner* prong, the Court must evaluate whether Conniff has made good faith efforts to repay her loan. To do so, the Court must examine Conniff's past conduct to determine whether her actions show a good faith effort to repay her loans. *See In re Acosta-Conniff*, 686 F. App'x at 649 ("The third prong looks to the debtor's past conduct to determine whether her actions in the past have manifested a good faith effort to repay that which she owes."). "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses; his default should result, not from his choices, but from factors beyond his reasonable control." *In re Mosley*, 494 F.3d at 1327 (citations omitted). While courts have recognized that a debtor's efforts to negotiate a repayment plan demonstrate good faith, a debtor

does not demonstrate bad faith by failing to enroll in an ICRP.  *See In re Mosley*, <u>494 F.3d 1320, 1327</u> (11th Cir. 2007); *In re Johnson*, <u>550 B.R. 874, 881</u> (<u>Bankr. M.D. Ala. 2016</u>).

Conniff has made payments on her student loan debt totaling $9,275.42.  Skerbinc's testimony, supported by the Lisa Thigpen affidavit, shows Conniff has been given five forbearances and one deferment in her student loan payments.  Admittedly, Conniff did not enroll in an ICRP, even though, according to the trial testimony of ECMC's litigation specialist, Conniff is eligible for an ICRP.  However, Conniff's reasoning for not applying for the ICRP was not to avoid repayment, but because she believed she did not have any available income to repay the student loan debt "in any amount." (<u>Doc. 78</u>, Transcript of January 26, 2015 at 16 & 66). Regardless, Conniff's failure to enroll in the ICRP is not per se bad faith.

Instead of applying for an ICRP, Conniff applied, three times, for partial forgiveness of her student loan debt for teaching in a rural area.  However, she was denied because she had consolidated her loans.  The Court finds that Conniff's failure to enroll in an ICRP does not detract from Conniff's good faith efforts to inquire for other loan forgiveness programs and her attempts to find better employment by applying for administrative positions.  *See In re Mosley*, <u>494 F.3d at 1327</u> (finding debtor's failure to enroll in an ICRP or pursue other non-bankruptcy options did not detract from the good faith demonstrated in debtor's inquiries to resolve the student loan obligations and debtor's attempts to obtain work).

Conniff has been working in the education field for over 20 years.  Conniff obtained her Ph.D. to qualify for advanced positions.  While Conniff has applied for various administrative positions to advance in her career, she has not been successful in her efforts.  In addition to her full-time teaching position, Conniff has worked part-time as an adjunct professor, has taught

summer school, and has worked part-time as a Spanish-English translator within the school system. Accordingly, the Court finds that Conniff made efforts to maximize her income.

To determine whether Conniff has made efforts to minimize her expenses, the Court will consider its findings in Part III.B.1.b. above wherein the Court considered Conniff's reasonable monthly expenses. Conniff's budget does not allow for extraneous spending. She has minimally budgeted for her and her sons' basic needs and has allowed for recreational and entertainment expenses, such as a community center family membership and a Netflix subscription. Conniff testified that she has cut her expenses as much as possible to enable her to work, keep her family fed, and keep a roof over her head. And, even still, she occasionally relies on family for assistance. The Court finds that Conniff has made efforts to minimize her expenses.

The Court recognizes that Conniff has made payments toward her student loan debt, obtained multiple forbearances and one deferment, and has attempted to obtain partial forgiveness of her student loan debt. *See In re Williams*, 492 B.R. 79, 91 (Bankr. M.D. Ga. 2013) ("A debtor who has made some payments on her loans and who otherwise attempts to deal with the loans through some, if not all, of the means made available by the lender, demonstrates a good-faith effort to repay her loans."). The Court is satisfied that Conniff has attempted, through the stated efforts, to maximize income and minimize expenses. As a result, the Court finds Conniff has demonstrated good-faith efforts to repay her loans; and, therefore, has satisfied the third *Brunner* prong.

## IV.  Conclusion

The Court is called upon to determine whether the student loan indebtedness owed by Plaintiff, Conniff is excepted from discharge pursuant to 11 U.S.C. § 523(a)(8), which provides that such indebtedness does not discharge unless doing so would impose an "undue hardship." The Bankruptcy Code does not define what constitutes an undue hardship; however, guidance is provided in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 and *In re Cox*, 338 F.3d 1238 (11th Cir. 2003) (adopting the *Brunner* test).  The Court's task here is to apply the three-prong *Brunner* test.  Part one of the test requires the Court to determine whether Conniff can maintain a minimal standard of living for herself and her dependents if required to repay the loans. The Court finds that she cannot, and that she has satisfied prong one of the *Brunner* test.  On remand, the District Court directed this Court to consider whether Conniff would qualify for an ICRP.  If so, and if she could make that reduced payment while still maintaining a minimal standard of living, she would fail prong one of the *Brunner* test.  While this Court is of the view that consideration of an ICRP violates *Brunner* and *Cox* and is contrary to 11 U.S.C. § 523(a)(8), this Court has nevertheless found that she qualifies for an ICRP and considered whether she could make the reduced ICRP payment and still maintain a minimal standard of living – considering the evidence adduced at trial.  While this secondary determination is a closer call, the Court nevertheless finds that Conniff cannot make the reduced payment and maintain a minimal standard of living.  Part two of the *Brunner* test requires the Court to consider whether additional circumstances exist indicating Conniff's state of affairs is likely to persist to a significant portion to the repayment period.  Part three considers Conniff's good faith efforts to repay the loans.  The Court finds that Conniff has satisfied the second and third *Brunner* prongs.  For these reasons, the

-38-
Case 13-03059   Doc 114   Filed 09/29/21   Entered 10/01/21 11:45:03   Desc Main
Document      Page 38 of 39

Court finds that excepting the indebtedness from discharge would impose an undue hardship and

that the indebtedness is discharged.

Done this 29th day of September, 2021.

William R. Sawyer
United States Bankruptcy Judge

c:      Aaron Gavin McLeod, Attorney for Plaintiff
       Catherine L. Steege, Attorney for Plaintiff
       Carl N. Wedoff, Attorney for Plaintiff
       Kristofor D. Sodergren, Attorney for Defendant
       Margaret H. Manuel, Attorney for Defendant